UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALLAS A. COLEMAN,                      CASE NO. 20-11568

       *Plaintiff*,                        HON. MARK A. GOLDSMITH
*v.*                                    DISTRICT JUDGE

COMMISSIONER OF                         HON. PATRICIA T. MORRIS
SOCIAL SECURITY,                        MAGISTRATE JUDGE

       *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 18.)

## I.    RECOMMENDATION

Plaintiff Dallas Coleman challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The matter was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANTING** the Commissioner's motion, (ECF No. 18), and **AFFIRMING** the Commissioner's final decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff's application for DIB was protectively filed on February 21, 2018 and filed on March 5, 2018. (ECF No. 10, PageID.113, 196–202.) Plaintiff alleges she became

disabled on January 1, 2018. (*Id.* at PageID.196.) The Commissioner denied the claim. (*Id.* at PageID.117–21.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on April 23, 2019. (*Id.* at PageID.74–100.) The ALJ issued a decision on July 1, 2019 and found that Plaintiff was not disabled. (*Id.* at PageID.49–72.) The Appeals Council denied review on April 23, 2020. (*Id.* at PageID.37–42.) Plaintiff sought judicial review on June 15, 2020. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 14, 18.)

### B.    Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual
> functional capacity and your age, education, and work experience to see if
> you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 10, PageID.68.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from the alleged onset date of January 1, 2018. (*Id.* at PageID.54.) Plaintiff's date last insured is December 31, 2022. (*Id.*) At step two, the ALJ concluded that Plaintiff's severe impairments were mild neurocognitive disorder secondary

to multiple sclerosis, multiple sclerosis (MS), trigeminal neuralgia, cervical radiculopathy, mild learning disability, depression, anxiety, obesity, migraines, and chronic fatigue syndrome. (*Id.* at PageID.55.) These impairments did not meet or medically equal a listed impairment at step three. (*Id.*) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. She is limited to frequent handling and fingering with the bilateral upper extremities. She is limited to no foot controls. She is limited to no driving a motor vehicle. She can never work around hazards, such as unprotected heights or moving dangerous mechanical parts. She can occasionally work in conditions of humidity and wetness, in conditions of extreme heat or cold. She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work. She is limited to making simple work-related decisions. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur very infrequently, if at all, and be adequately and easily explained. She is limited to doing no mathematical calculations without the aide of a calculator or cash register. She can respond appropriately to occasional interaction with supervisors, co-workers, and the general public.

(*Id.* at PageID.58–59.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.59.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.67.) This included representative jobs such as custodian, office clerk, and laborer. (*Id.*) Accordingly, Plaintiff was found to be not disabled.

### E.      Administrative Record

#### 1.      Overview of Medical Evidence

##### a.      Treatment Notes

In February 2016, Plaintiff presented to Dr. Amy Kodrick a number of symptoms, including numbness and tingling on the left side of her face, tingling in her arms and legs, a history of migraines, and a history of anxiety and depression. (ECF No. 10, PageID.289.) Her history included a January 2015 MRI that showed nonspecific white matter lesions. (*Id.*) She had a lumbar puncture increased IgG synthesis rate. (*Id.*) Plaintiff's physical examination showed she was well-nourished and well developed. (*Id.* at PageID.291.) She had 5/5 motor strength in all four extremities. (*Id.*) Her sensation to pin was intact in all four extremities. (*Id.*) She had a normal gait and was able to stand without difficulty. (*Id.* at PageID.292.) Plaintiff was prescribed Valium and Fioricet, and Topamax was increased from 50mg to 100mg. (*Id.*) The record here noted Plaintiff's history with relapsing remitting multiple sclerosis and a history of migraine cephalgia, with headaches occurring four to five times per week. (*Id.*) An updated MRI report, at this time, showed Plaintiff had few lesions, and that likely represented mild multiple sclerosis without enhancement. (*Id.* at PageID.293.) There was also no acute ischemia, enhancing mass, or mass effect. (*Id.*)

Plaintiff returned to Dr. Kodrick in August 2016. (*Id.* at PageID.294.) Other than one reaction, Plaintiff was doing well on medication. (*Id.*) Plaintiff continued to have some tingling and parestheias in her face, hands, and feet. (*Id.*) Her headaches were described as occasional, occurring less than once per week. (*Id.*) Plaintiff recently started taking Lexapro. (*Id.*) She was also taking vitamins. (*Id.*) Her physical examination appeared

6

unchanged. (*Id.* at PageID.295–96.) Plaintiff's medication plan continued as she was doing well: Copaxone was for her multiple sclerosis; Topamax was for her migraines. (*Id.* at PageID.296.) Flexeril was resumed at a low dose. (*Id.*)

In March 2017, Plaintiff reported site reactions to her daily Copaxone injections, increased headaches, and difficulty tolerating Topamax. (*Id.* at PageID.301.) Plaintiff's medication was modified to address headaches. (*Id.*) Her physical examination appeared consistent. (*Id.* at PageID.299–300.)

In October 2017, Plaintiff had an annual physical. (*Id.* at PageID.345.) Plaintiff reported feeling good and having a good energy level. (*Id.*) She was sleeping well and for six hours a night. (*Id.*) A review of Plaintiff's systems showed she was negative for fatigue, weakness, and headaches. (*Id.* at PageID.346.) Her physical examination showed no distress, normal musculoskeletal range of motion, normal reflexes, and normal muscle tone. (*Id.* at PageID.347.) A depression screening was negative, and her BMI was elevated. (*Id.*)

In December 2017, Plaintiff reported to the emergency department at Monroe Regional Hospital, and she stated her headaches have lasted for the last two months, and they are worse than normal. (*Id.* at PageID.342.) Plaintiff also reported falling in a recent week, and since then, her headaches were worse. (*Id.*) Plaintiff's systems were positive for neck pain and headache, but negative for weakness. (*Id.*) Plaintiff had a normal range of motion for her neck. (*Id.* at PageID.343.) She had a diagnosis of intractable headache. (*Id.*) Plaintiff was given medication for her headache, and she was discharged from care with improvement. (*Id.*)

In March 2018, Plaintiff reported abdominal pain that had a sudden onset, with pressure that intermittently radiates to her chest. (*Id.* at PageID.338.) Other than being anxious, Plaintiff had a normal physical examination. (*Id.* at PageID.339.) Plaintiff was given medication for her left upper quadrant pain, and she was discharged as improved. (*Id.* at PageID.340.)

Also, in March 2018, Plaintiff underwent a brain MRI. (*Id.* at PageID.487.) The MRI showed mild white matter signal alteration showing demyelination of multiple sclerosis. (*Id.* at PageID.488.) There was also trace mucosal thickening in the sinuses and trace serous fluid at mastoid air cells. (*Id.*)

In April 2018, Plaintiff's appointment with Dr. Ann Hehl-Bisson showed Plaintiff's history of present illness was gradually worsening and causing significant distress. (*Id.* at PageID.441.) Plaintiff's symptoms included depressed mood and excessive worry. (*Id.*) Plaintiff also was positive for joint paint and myalgias. (*Id.* at PageID.443.) She was negative for neck pain, dizziness, and headaches. (*Id.*) Other than depressed mood, Plaintiff had a normal physical exam. (*Id.*) Plaintiff further complained of bilateral upper and lower extremity pain and weakness that was worsening. (*Id.*) She was started on Zoloft. (*Id.* at PageID.444.)

In July 2018, Plaintiff had a normal physical examination. (*Id.* at PageID.394–95.) Her assessment/plan included multiple sclerosis, obesity, chronic fatigue syndrome, headache, depressive disorder, and neuropathic pain. (*Id.* at PageID.395.)

In August 2018, Plaintiff's Zoloft prescription was increased, and she was referred to Creative Counseling. (*Id.* at PageID.451.) She had reported depressed mood and fatigue,

but no decreased concentration or anxiety. (*Id.* at PageID.448.). In September 2018, Plaintiff was started on IV steroids for her MS, and she was treated for an upper respiratory infection. (*Id.* at PageID.458.) Plaintiff reported improvement in mood with Zoloft. (*Id.* at PageID.459.)

From September 2018 to November 2018, Plaintiff received treatment from Creative Counseling Choices. (*Id.* at PageID.397–405.) Plaintiff was assessed a GAF score of 55. (*Id.* at PageID.398.) Her treatment plan was to reduce her depression. (*Id.*) Plaintiff discussed with a therapist her feelings of depression, of being overwhelmed, and of her deteriorating medical condition. (*See id.* at PageID.403–05.)

In January 2019, Plaintiff continued on Copaxone and IV steroids every other month. (*Id.* at PageID.464.) She felt her mood/depression was slightly worse recently, and she was more irritable and angrier. (*Id.*) She complained of burning nerve pain in her back. (*Id.*) Plaintiff's Zoloft was increased, and she was prescribed Lidocaine cream for her back pain. (*Id.* at PageID.467.) Plaintiff also reported an upper respiratory infection, with symptoms of coughing, joint pain, and rhinorrhea. (*Id.* at PageID.472.) Plaintiff also reported worsened back pain, leg pain, and foot pain. (*Id.* at PageID.475.) She reported difficulty with activities of daily living. (*Id.*)

Also, during this period of April 2018 to January 2019, Plaintiff had treatment from Dr. Ram Garg. (*Id.* at PageID.407.) In April 2018, Plaintiff reported her history of MS and symptoms of limb weakness and incoordination, fatigue, migraine headaches, numbness and tingling, and dizziness. (*See, e.g., id.* at PageID.408, 412, 415, 419, 422, 425, 429, 432, 436.) Plaintiff indicated hot environments exacerbate some symptoms. (*Id.*) Plaintiff also

reported back pain that causes difficulty walking and falls. (*Id.* at PageID.408.) Plaintiff claimed her MS conditions were worsening since diagnosis. (*Id.*)

With Dr. Garg, Plaintiff's physical exams showed that Plaintiff was alert and not in acute distress. (*Id.* at PageID.409, 413, 416, 420, 423, 426, 430, 433, 437). She had a normal gait. (*Id.*) Plaintiff had normal neurological examinations, including normal attention span and ability to concentrate. (*Id.* at PageID.410, 414, 417, 420, 424, 427, 431, 434, 438). She had normal strength and muscle tone in all extremities. (*Id.* at PageID.410, 414, 417, 421, 424, 427, 431, 434, 438.) She had positive Babinski sign. (*Id.*)

Dr. Garg recommended medication for Plaintiff, including Gabapentin, Ampyra, Zoloft, and Copaxone. (*Id.* at PageID.438.) Plaintiff received an IV of Methylprednisolone. (*Id.* at PageID.427.) Dr. Garg further recommended no heavy lifting (over 15 pounds) (*id.* at PageID.410, 414, 418, 421, 431, 438), and he noted Plaintiff took 25 seconds to walk 25 feet (*id.* at PageID.438).

### b.    Medical Opinion

Plaintiff underwent a mental status evaluation in June 2018. (*Id.* at PageID.384.) The record notes Plaintiff's history of multiple sclerosis first diagnosed in 2014, migraines occurring three to five times per week, severe fatigue, frequent naps, memory/concentration problems, and cramping in her hands and feet. (*Id.*) Plaintiff continued to work through December 2017 and left employment because of MS symptoms. (*Id.*) Plaintiff was diagnosed with mild neurocognitive disorder secondary to multiple sclerosis and mild learning disability. (*Id.* at PageID.386.) Plaintiff was described as

> Presenting with some mild limitations in the areas of arithmetic and short-term memory consistent with reports of a mild learning disability. She is also evidencing some problems with concentration and attention that are likely related to her multiple sclerosis symptoms. It is this examiner's opinion that she would have difficulty following more than simple directions. There are no current psychiatric problems that seem to be preventing her from appropriately interacting with others.

(*Id.* at PageID.386.)

Plaintiff was evaluated by consultative examiner Dr. Tanvir Qureshi. (*Id.* at PageID.389–395.) Here, Dr. Qureshi indicated Plaintiff had the ability to sit, stand, bend, stoop, carry, push, pull, and climb stairs. (*Id.* at PageID.389.) Further, she had normal reflexes across all extremities. (*Id.* at PageID.389–90.) She could stand from a seated position and maintain balance while standing. (*Id.* at PageID.390.) Plaintiff had a normal gait and no need for a walking aid. (*Id.*) Her grip strength was rated 5/5. (*Id.*) She had normal range of motion in her spine, shoulders, elbows, hips, knees, ankles, and wrists. (*Id.* at PageID.391–92.) And flexion and extension of the joints in her hands and fingers were normal. (*Id.* at PageID.392.)

Plaintiff's case was evaluated by state agency doctor David Mika in August 2018. (*Id.* at PageID.112.) Plaintiff's severe medically determinable impairment was multiple sclerosis. (*Id.* at PageID.107.) Plaintiff's residual functional capacity was determined to be as follows. Plaintiff could occasionally lift/carry 20 pounds, and frequently lift/carry 10 pounds. (*Id.* at PageID.108.) She could sit or stand/walk for six hours of an eight-hour workday. (*Id.* at PageID.109.) Plaintiff could frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; and occasionally climb ladders. (*Id.*) She had no manipulative or

environmental limitations. (*Id.*) Plaintiff was determined to be able to perform light work and accordingly was not disabled. (*Id.* at PageID.111.)

In February 2019, Plaintiff's neurologist, Dr. Ram Garg, provided a medical source statement. (*Id.* at PageID.486.) Dr. Garg identified Plaintiff's diagnoses as multiple sclerosis, vertigo, trigeminal neuralgia, cervical radiculopathy, and migraines. (*Id.* at PageID.484.) Dr. Garg opined that Plaintiff could lift/carry 15 pounds occasionally and 5 pounds frequently. (*Id.*) He said this limitation is supported by Plaintiff's difficulty walking, her loss of balance, her dizziness, and her pain in legs and feet. (*Id.*) Similarly, Plaintiff could stand/walk for 15 minutes in an eight-hour workday. (*Id.* at PageID.485.) Next, Plaintiff sitting ability was not affected by her impairments, but she would need to keep her legs elevated 30° for one to two hours per day. (*Id.*) She would need unscheduled breaks every 15 minutes, and she would need 2 hours of rest in a workday. (*Id.*) Plaintiff would likely be absent more than four days per month because of her impairments. (*Id.*) Plaintiff could occasionally look down, turn her head, and hold her head in a static position; she could rarely look up, twist, or stoop; and she could never crouch, climb ladders or stairs. (*Id.* at PageID.486.) Plaintiff would have enough pain to frequently interfere with her attention and concentration. (*Id.*)

Also, in February 2019, Dr. Anna Hehl-Bisson wrote a letter with her opinion of Plaintiff's condition. (*Id.* at PageID.489.) Dr. Hehl-Bisson indicated that Plaintiff was diagnosed with multiple sclerosis, and the symptoms of MS can be disabling. (*Id.*) She indicated Plaintiff struggles with daily tasks. (*Id.*) She said Plaintiff has been unable to work because of her MS symptoms. (*Id.*)

### 2.    Application Reports and Administrative Hearings

### a.    Function Report

Plaintiff says she cannot work because of her multiple sclerosis and extreme fatigue. (ECF No. 10, PageID.235.) She also stated she has migraines, depression, and difficulty with every-day problems. (*Id.*) She has anxiety, weakness, and some tingling in her hands. (*Id.*) She cannot tolerate heat. (*Id.*)

Plaintiff's daily activities include fixing breakfast, doing dishes, putting clothes in the washer, taking short walks, visiting or calling friends, fixing lunch and dinner, and taking medication. (*Id.* at PageID.236.) These activities are limited when she feels unable to do them. (*Id.*) She feeds a dog, but Plaintiff's husband walks the dog. (*Id.*) Plaintiff has difficulty sleeping because of restless legs and pain in her feet. (*Id.*) She does not have any problems with personal care. (*Id.*) She needs help remembering to take her medication. (*Id.* at PageID.237.) Plaintiff can prepare sandwiches and frozen dinners. (*Id.*) She can do dishes, laundry, and light cleaning three to five times per week. (*Id.*) Plaintiff can go out alone about four to five times per week. (*Id.* at PageID.238.) She does not drive because of anxiety and concentration problems. (*Id.*) Plaintiff can shop about two times per week for 45 minutes or until she is tired. (*Id.*) Plaintiff can pay bills but has difficulty with the math to balance a checking account because of a learning disability. (*Id.* at PageID.238–39.) She calls or visits with family two or three times per week. (*Id.* at PageID.239.) She sometimes feels angry, upset, or that she has no patience with family, friends, or neighbors. (*Id.* at PageID.240.) Plaintiff says she cannot deal with stress, and she is always fatigued and needing to use the bathroom. (*Id.*)

Plaintiff listed the following as limited by her conditions: lifting, squatting, standing, reaching, walking, kneeling, climbing stairs, concentrating, using her hands, and getting along with others. (*Id.*) Further, she said she can lift 10 pounds or less, she has difficulty lifting her arms overhead, and she is short of breath with exertion. (*Id.*) She has tingling in her hands, weak feeling, headaches, and poor concentration. (*Id.*) Plaintiff can follow written instructions, and she can follow spoken instructions if they are not complicated. (*Id.*) She can get along with authority figures. (*Id.* at PageID.241.) She cannot handle stress, but she can handle changes in routine. (*Id.*)

Plaintiff has medication side-effects of flu-like symptoms, headache, stomachache, and pain. (*Id.* at PageID.242.)

### b.      Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she cannot work because of constant pain in her legs and of problems with her grip strength. (ECF No. 10, PageID.84.) She has shooting pain in her spine. (*Id.*) She has a bad memory. (*Id.*) And she cannot deal with stressful situations. (*Id.*) Plaintiff has a primary care doctor and a neurologist for treatment. (*Id.*) Plaintiff is taking medication, and she experiences side-effects she described as flu-like symptoms, heart racing, body aches, nausea, and feeling ill. (*Id.* at PageID.84–85.) She undergoes steroid injections to help with pain and medication side-effects; the time period between injections changed from monthly to three times per week to daily. (*Id.* at PageID.91.)

Plaintiff described constant pain in her feet and legs, and pain in her hands, spine and face. (*Id.* at PageID.87.) She said medication controls the pain somewhat, but it is still present. (*Id.*) Standing makes the pain worse. (*Id.*) She also has difficulty sitting, with leg

and spine pain. (*Id.* at PageID.90.) Plaintiff would not be able to do a job sorting nuts and bolts while she is seated because her hands would cramp. (*Id.* at PageID.87.) She drops things all the time. (*Id.* at PageID.90.) Plaintiff has migraine headaches, about two to three times per week. (*Id.* at PageID.92.) Plaintiff takes Topamax and tries to lie down in a dark room to remedy her headaches. (*Id.*) Lying down can vary from two hours to all day, depending on how she feels, and this occurs four or five times per month. (*Id.* at PageID.93.)

Plaintiff described symptoms of mental health issues where she is emotional or frustrated easily, and she is depressed, despite medication. (*Id.* at PageID.87–88.) Next, Plaintiff has a learning disability where math calculations are difficult. (*Id.* at PageID.88.)

Plaintiff described being heat sensitive, where experiencing heat makes her feel dizzy and sick. (*Id.*) Humidity and dampness bother her joints and legs. (*Id.* at PageID.89.)

Plaintiff described her typical day including taking her medicine, feeding the dog, and napping. (*Id.* at PageID.85.) Plaintiff also lies down for a couple of hours and naps. (*Id.*) Plaintiff makes breakfast (usually cereal) and sometimes goes out to lunch with her sister. (*Id.* at PageID.85–86.) Plaintiff loads the dishwasher and the washing machine. (*Id.* at PageID.85.) She sometimes uses the computer to talk to people online. (*Id.*) Plaintiff's husband cooks dinner. (*Id.* at PageID.86.) Her hobbies include reading. (*Id.*)

The dog is Plaintiff's support animal. (*Id.* at PageID.86.)

Plaintiff never had a driver's license. (*Id.* at PageID.90.)

### c.    The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE identified Plaintiff's past work as waitress, cashier, and ticket taker. (*Id.* at

PageID.95.)

The ALJ inquired of the VE about the following hypothetical, assuming Plaintiff's

age, education, and work experience:

> She can do work at the light exertional level except she can occasionally
> climb ramps and stairs, never climb ladders, ropes, or scaffolds and can
> occasionally balance, stoop, kneel, crouch, and crawl. She is limited to
> frequent handling and fingering with the bilateral upper extremities. She is
> limited to no foot controls. She is limited to no driving a motor vehicle. She
> can never work around hazards such as unprotected heights or moving
> dangerous mechanical parts. She can occasionally work in conditions of
> humidity and wetness and conditions of extreme heat or cold. She is also
> limited to performing simple, routine, and repetitive tasks but not at
> production rate pace. For example, no assembly line work. She is limited to
> making simple, work-related decisions. She is limited to tolerating few
> changes in the work setting defined as routine job duties that remain static
> and are performed in a stable predictable work setting. Any necessary
> changes need to occur very infrequently, if at all, and be adequately and
> easily explained. She is limited to doing no mathematical calculations
> without the aid of a calculator or cash register.

(*Id.* at PageID.95.) The VE indicated that the cashier job and the ticket taker job could be

performed under this hypothetical. (*Id.*) The VE identified other jobs at the light exertional

level that could be done under this hypothetical: custodian (620,000 jobs nationally), office

clerk (1,040,000 jobs nationally), and laborer (470,000 jobs nationally). (*Id.* at PageID.96.)

The ALJ and the VE identified that the VE's testimony was consistent with the *Dictionary*

*of Occupational Titles* (*DOT*), except that analysis on production pace and mathematical

calculations was based on the VE's knowledge and experience. (*Id.*)

For the second hypothetical, the ALJ inquired of the same limitations as the first hypothetical, with the following additional limitations: "She is limited to responding appropriately to occasional interaction with supervisors, co-workers, and the general public." (*Id.*) The VE said that the past relevant work was not within this limitation, and the positions previously identified were reduced to 400,000 jobs for custodian, 600,000 for office clerk, and laborers would be the same. (*Id.* at PageID.97.) The VE indicated this information is consistent with the *DOT*, except for production pace and mathematical calculations. (*Id.*)

For the third hypothetical, the ALJ inquired of the same limitations as the second hypothetical, but the exertional level was changed to sedentary. (*Id.*) There is no past work that is available. (*Id.*) The VE identified jobs within this hypothetical as office clerk (180,000 jobs nationally), order clerk (20,000 jobs nationally), and surveillance system monitor (20,000 jobs nationally). (*Id.*) The VE indicated this information is consistent with the *DOT*, except for production pace and mathematical calculations. (*Id.* at 97–98.)

The fourth hypothetical was about a limitation to lie down during the workday outside of normal breaks. (*Id.* at PageID.98.) Next, there was a limitation about being off-task for 25% or more of the workday. (*Id.*) Finally, there was a limitation about missing two or more workdays per month on an ongoing basis as unplanned absences. (*Id.*) Each of these are work preclusive. (*Id.*)

Finally, if there was a limitation for occasional handling and fingering, then there are no jobs at the light exertional level, and the surveillance system monitor job remains at the sedentary exertional level. (*Id.* at PageID.98–99.)

17

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)      Licensed physician (medical or osteopathic doctor);

(2)      Licensed Psychologist, which includes:

     (i)      A licensed or certified psychologist at the independent practice level; or

     (ii)      A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)      Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)      Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)      Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior

19

administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation

requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we

articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

    (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)   Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood,

thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will

consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.     Arguments and Analysis

#### 1.     The ALJ properly evaluated the medical opinions of Dr. Garg

Plaintiff claims that the ALJ did not properly evaluate the opinions of Dr. Garg. The ALJ found the opinion of Dr. Garg "unpersuasive as relied heavily upon the claimant's subjective complaints and is not supported by his own examination findings." (ECF No. 10, PageID.62.) The ALJ cited treatment records showing Plaintiff's lack of impairment in walking abilities, her normal muscle strength and tone, and her normal gait. (*Id.* at PageID.61, citing ECF No. 10, PageID.464, 467.) The ALJ also cited that Dr. Garg opined that Plaintiff was unable to work, which is an issue reserved for determination by the Commissioner. (*Id.* at PageID.62, citing 20 C.F.R. § 404.1520b(c).) Further, the ALJ considered Dr. Garg's medical source statement with limitations that include Plaintiff's needs for exertional limits, standing/walking limits, unscheduled breaks, being absent from work, postural limitations, limitations for head movement. (*Id.* at PageID.65, citing ECF No. 10, PageID.484–86.) Finally, the ALJ noted Dr. Garg's opinion that Plaintiff's pain would interfere with her attention and concentration to perform simple work tasks. (*Id.*) The ALJ further explained this opinion was largely unpersuasive because these limitations

are not consistent with the medical evidence that generally showed Plaintiff having a normal range of motion, normal gait, and normal strength and tone in her extremities. (*Id.* at PageID.65, citing ECF No. 10, PageID.388–95, 425–30, 431, 434, 436–38, 463–67.)

Plaintiff claims that the ALJ misconstrues the evidence related to Dr. Garg's opinion. However, the ALJ accurately cited treatment notes with Dr. Garg's examination findings that Plaintiff had no impairment tandem walking, no impairment of heel-to-shin, normal strength and tone in lower extremities and normal gait. (*Id.* at PageID.65, citing PageID.431, 434.) These treatment notes were dated May 2018 and July 2018. Yet, at the same time, Dr. Garg stated in the history of present illness section that Plaintiff was "unable to do activities of daily living (due to walking limitations), unable to work and unable to do housework." (*Id.* at PageID.432, 435.) Given this comment of Plaintiff's condition, in the history of present illness, was contemporaneous with Dr. Garg's objective examination findings showing no limitation in Plaintiff's physical walking capability, the ALJ appropriately discounted Dr. Garg's opinion. *McCready v. Comm'r of Soc Sec.*, 2012 WL 1060088, at *8 (E.D. Mich. 2012) (observations in "history of present illness" section "are merely the narrative description of plaintiff's subjective complaints and symptoms and are not opinions regarding plaintiff's limitations or restrictions"). Plaintiff claims that while *on that date* she had normal walking-related examinations, she has other cited subjective examples—fatigue, walking problems, ataxia, spasticity, incoordination, limb weakness, and a timed walk of 25 feet in 25 seconds—of her worsening MS condition. (Pl. Br., ECF No. 14, PageID.508., citing section of history of present illness in ECF No. 10,

PageID.435[1].) However, the same physical examination characteristics at issue here—Plaintiff's coordination, gait, and muscle strength—recurred six more times in Dr. Garg's subsequent records. (*See*, *e.g.*, ECF No. 10, PageID.410, 414, 417, 421, 424, 427.) Here, the ALJ is not required to accept Plaintiff's subjective complaints when making a determination of disability. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The fact that these subjective complaints appeared in Dr. Garg's recorded history of present illness is also not outcome determinative in Plaintiff's case. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (a "treating physician [opinion] was not entitled to deference because it was based on [Plaintiff's] subjective complaints, rather than objective medical data.").

Next, Plaintiff claims that if she was not experiencing walking difficulty, there would be no reason to start her on Ampyra[2] medication. Plaintiff overstates her claim; the fact Plaintiff is on medication does not alone suggest work-related limitations under the disability evaluation procedure. The ALJ recognized the evaluation of Plaintiff's symptoms under the two-step procedure of SSR 16-3p. The ALJ considered Plaintiff's function report and hearing testimony where Plaintiff claimed leg pain, difficulty walking and climbing stairs, and that standing long exacerbates her symptoms. (ECF No. 10, PageID.59.) The ALJ considered treatment notes that included Plaintiff's subjective complaints related to her walking abilities and related pain and weakness; considered

---

[1] While Plaintiff cites "PageID.399", she is actually citing Page 399 of the Social Security Administration's transcript of the record of proceedings, and she is not citing the US District Court's bates numbering, which for purposes here is at PageID.435.

[2] "Ampyra is a prescription medicine used to improve walking in adults with multiple sclerosis (MS)." https://www.drugs.com/ampyra.html

examinations that showed normal gait and lower extremity strength; and explained the persuasiveness of the opinion evidence. (*Id.* at PageID.60–66.) The ALJ ultimately concluded—by considering Plaintiff's treatment history, medication use, effectiveness of treatment, and her activities of daily living—that Plaintiff's impairments are not disabling. (*Id.* at PageID.66.) Further, the ALJ stated "This is not to say that [Plaintiff] was symptom free or did not experience difficulty performing some tasks. However, the objective evidence does not demonstrate the existence of limitations of such severity [to preclude Plaintiff from all work]." (*Id.*) Here, the ALJ satisfied the overall procedure of disability evaluation of Plaintiff's impairments and her symptoms. The fact that there exists some parts of the record that are supportive of Plaintiff's position does not justify remand. *Jones*, 336 F.3d at 476.

Plaintiff asserts the ALJ presents a lack of understanding of the nature of Plaintiff's MS disease, particularly given the ALJ's analysis of the opinions of Dr. Garg, who is a neurologist. Contrary to Plaintiff's assertion, the ALJ recognized Dr. Garg's specialty in the decision and at Plaintiff's hearing via review of the record with Plaintiff's counsel. (ECF No. 10, PageID.61, 79.) Nevertheless, given the departure from the former treating source rule, the fact that Dr. Garg is a neurologist is to be and it was considered; but the most important factors to consider in this record are the supportability and consistency of the opinion with the medical evidence. 20 C.F.R. § 404.1520c(c). As the ALJ explained, and as discussed above, Dr. Garg's opinions were not supported by the medical evidence. Next, Plaintiff continues with her citation of her subjective symptoms and their triggers, her alleged frequency of her symptoms, and alleged side-effects of medication. Again,

Plaintiff's subjective symptoms alone are not determinative of Plaintiff's disability, and Plaintiff does not cite to supportive medical evidence of these claims. Finally, the ALJ explained that Dr. Garg's opinion that Plaintiff avoid triggers to migraines was not stated in vocationally relevant terms, thus this limit is unpersuasive as to support any particular work-related limitation. The ALJ may appropriately reject limitations that are vague and not defined. *See*, *e.g.*, *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008).

Rather than cherry-picking evidence, as Plaintiff claims the ALJ did, the ALJ's analysis could more neutrally be described as weighing the evidence. *See*, *e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (noting that alleged cherry-picking "can be more neutrally described as weighing the evidence[.]")

### 2.  The ALJ did not err in considering all functional impairments in the RFC assessment.

Plaintiff claims the ALJ erred by not considering all of Plaintiff's functional limitations in the RFC. She specifically identifies her headaches, her migraines, her medication side-effects, her need for breaks, and her need to elevate her legs as conditions that were not fully considered. Plaintiff is incorrect.

Plaintiff cites the record of Plaintiff's medication prescriptions for her conditions. Further, she cites her testimony as to frequency of her migraines and naps, being affected by light, and being affected by extreme temperatures. The ALJ acknowledged these conditions by citing the function report and Plaintiff's testimony. (ECF No. 10, PageID.59–60.) The ALJ limited Plaintiff to simple, routine, repetitive tasks, no production-rate pace,

and simple work decisions partially based on the opinion of the psychiatric consultative examiners and Plaintiff's function report and hearing testimony. (*Id.* at PageID.58–59, 62.) The ALJ limited Plaintiff to certain environmental conditions of occasional work in extreme heat or cold, based on her hearing testimony and migraines, thus going further in limitation that what state agency consultant Dr. Mika opined. (*Id.* at PageID.58–59, 65.) In contrast, Plaintiff's light sensitivity was recognized by the ALJ as a symptom and not a work-related limitation, given the record evidence of inconsistent reporting of light sensitivity. (*Id.* at PageID.64. *Compare id.* at PageID.408, 412, 415 *with* PageID.419, 422, 425, 429, 432, 436.)

Next, the ALJ considered Dr. Garg's opinion regarding Plaintiff's need for leg elevation and for breaks. (*Id.* at PageID.65.) The ALJ explained that, regarding Dr. Garg's opinion, that Plaintiff was not as limited as alleged and that she normal range of motion, strength, tone, and gait in the lower extremities. (*Id.*) The Commissioner correctly addresses that there is no medical explanation for a limitation for leg elevation given Plaintiff's generally unremarkable lower extremities (Def. Br., ECF No. 18, PageID.542), nor does Plaintiff provide an explanation here. Further, Plaintiff did not testify as to a need for leg elevation, and she only indicated leg pain when standing and nerve pain when sitting. (*Id.* at PageID.87, 90.) Similarly, her function report is silent as to a need for leg elevation. (*Id.* at PageID.235–42.) Next, Plaintiff appears to attribute her need for breaks due to fatigue, headaches, or medication. (Pl. Br., ECF No. 14, PageID.511.) Despite the ALJ finding Dr. Garg's opinion not persuasive, Dr. Garg did not mention fatigue. (ECF No. 10, PageID.484.) Further, the medical record is inconsistent as to fatigue. (*Id.* at

PageID.429, 435, 461; *see also id.* at PageID.448, 452, 461, 465, 467, 471, 474, 478.) Next, while Dr. Garg considered headache-related limitations, in contrast, consultative examiners also considered Plaintiff's headaches, and did not opine as to a need for breaks. *See, e.g.,* Dr. Czarnecki, *id.* at PageID.384; Dr. Qureshi, *id.* at PageID.394; Dr. Mika, *id.* at PageID.102.) Next, as to medication side-effects, Plaintiff testified to nausea, vomiting, flu-like symptoms, body aches, and the need to lie down. (*Id.* at PageID.85.) The function report is similar by reporting flu-like symptoms, headache, upset stomach, and pain. (*Id.* at PageID.242.) This is not consistent in the record. (ECF No. 10, PageID.59, 85; *see* ECF No. 10, PageID.409, 413, 420, 423, 426, 430, 433, 437, 443, 446, 450, 454, 456, 457, 460, 461, 465, 470, 473, 474, 477, 478; *but see* ECF No. 10, PageID.324, 338, 394.) Dr. Garg does not discuss clearly any medication side-effects. (*Id.* at PageID.484.) Finally, "many courts in this Circuit hold that a medical source's estimates on absenteeism and the need for unplanned work breaks are not medical opinions entitled to deference, even when made by treating physicians." See *Swanson v. Comm'r of Soc. Sec.*, 2020 WL 1818435, at *11 (E.D. Mich. 2020) (collecting cases), *rep. and rec. adopted* 2020 WL 1283789 (E.D. Mich. 2020). Taken together, this record is not supportive of Plaintiff's claimed need for leg elevation and breaks.

Plaintiff's citation to *Morin v. Comm'r of Soc. Sec.*, 259 F.Supp.3d 678, 685 (E.D. Mich. 2017) and *Brents v. Comm'r of Soc. Sec.*, 2018 WL 4784660, at *4 (E.D. Mich. 2018)[3] are inapt to the instant case. In *Morin*, the Court identified a flawed RFC because it

---

[3] *Rep. and Rec. adopted*, 2018 WL 345843 (E.D. Mich. 2018).

was not consistent with both that plaintiff's testimony about her need to raise her legs and medical record that reports Plaintiff's edema. *Morin*, 259 F.Supp.3d at 685. Plaintiff in the instant case cites to neither. In fact, the medical record reports numerous instants where edema was not present. (ECF No. 10, PageID.61, citing PageID.325; *see also* ECF No. 10, PageID.395, 410, 413–14, 417, 420, 423–24, 426–27, 430–31, 433–34, 437–38.) Next, *Brents* is inapt for the same edema issue as *Morin*, and in addition, *Brents*' analysis was subject to the former treating-source rule, which was altered as of March 27, 2017. *See* 20 C.F.R. §§ 404.1520c, 404.1527. Under the former rule, an ALJ had to provide good reasons that were sufficiently specific in analysis for discounting a treating source's opinion, based on the medical evidence of record; a lack of specificity denoted a lack of substantial evidence. *See Brents*, at *3 (citations omitted). Here, in contrast, the ALJ used the current requirements and properly noted the lack of edema and properly explained the persuasiveness of the Dr. Garg opinion. (*See* ECF No. 10, PageID.61.)

Overall, the ALJ is only required to include limitations within the RFC that are found to be supported. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994). Further, the ALJ is not required to accept VE testimony in response to hypothetical limitations that the ALJ does not accept. *See Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019). Here, the ALJ properly relied on limitations that were supported by the medical record, rather than the subjective limitations suggested here by Plaintiff.

**H.     Conclusion**

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 14), **GRANTING** the Commissioner's motion, (ECF No. 18), and **AFFIRMING** the Commissioner's final decision denying benefits.

**III.   REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 7, 2021                                  S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge